# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

United States of America,  Case No. 3:14CR403

    Plaintiff

    v.  **ORDER**

Kurt Mallory, et al.,

    Defendants

This is a criminal case in which a jury found defendants Kurt Mallory, Margaret McKnight, and Susan Pioch guilty of multiple crimes arising from a scheme to create and probate a fake will and thereby acquire the $2.2 million estate of Martin Fewlas.

The defendants timely moved for a new trial under Fed. R. Crim. P. 33, but I denied relief. *U.S. v. Pioch*, 2017 WL 1376410 (N.D. Ohio 2017).

Defendants appealed, and, as relevant here, the Sixth Circuit reversed my denial of Mallory's new trial motion. It did so because it found that I had applied the wrong standard – namely that of Fed. R. Crim. P. 29, rather than that of Fed. R. Crim. P. 33. *U.S. v. Mallory*, 902 F.3d 584, 596–97 (6th Cir. 2018). The case is now before me on remand to adjudicate the motions under Rule 33. *Id.* at 597.

**Standard of Review**

As the Circuit explained in *Mallory*, *supra*, 902 F.3d at 596, Rule 33 authorizes me to grant a new trial:

> if a verdict is against the "manifest weight" of the evidence. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). Such a motion calls on the trial judge

to take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice. *See id.* at 593 (citing *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). This differs from a motion under Rule 29, which challenges the sufficiency of the evidence. Rule 29 asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) – not whether the *trial judge himself* believes the manifest weight of the evidence supports the verdict, *see Hughes*, 505 F.3d at 592–93. So while Rule 29 requires the court to view the evidence in a light most favorable to the prosecution, *id.* at 592, Rule 33 does not.

## Discussion

The will at issue bore the date of June 16, 2010, a few days before Fewlas's death.

The government's theory of the case was that Pioch, an attorney, had drafted the will, on which Gary Mallory, Kurt's father and fellow conspirator who subsequently became a government witness, signed Fewlas's name on either August 30, August 31, or September 1, 2010.

The gravamen of the defense was that Fewlas, who the evidence showed viewed McKnight, whom he had known for several years, as if she were his daughter, decided to create a new will leaving his estate to McKnight – thereby effectively revoking an earlier will, executed in 1993, that left his estate to a distant family member. This was so, in part, also because McKnight bore a remarkable resemblance to his late wife. Moreover, according to the defendants, Kurt and McKnight had been attentive caretakers as Fewlas's health declined.

In the end, the outcome depended on whether the jury believed that the defendants did or did not forge the will. That determination, in turn, depended on *whom* the jury believed. As the verdict shows, the jury's assessment of credibility favored the government.

With, as I discuss below, good and ample reasons. Among those reasons were:

- Gary's testimony was plausible on its own and extensively corroborated by other evidence.

2

- Pioch could have been present when the forgery occurred.
- The government's handwriting testimony was more credible than that from the defense.
- The evidence supporting the "caretaker" contention was weak and undercut by contrary evidence.
- Pioch's testimony was not merely of dubious veracity – it was manifestly false on its face.

In light of these facts and others I discuss in more detail below, the manifest weight – indeed, the overwhelming weight – of the evidence indisputably justifies denial of Mallory's motion.[1] Most emphatically, this was not, as he claims, one of those "extraordinary" cases "where the evidence preponderates heavily against the verdict." *U.S. v. LaVictor*, 848 F.3d 428, 455 (6th Cir. 2017) (internal quotation marks omitted).

## A. Gary Mallory's Testimony Was Credible

The core of Gary's testimony was that he had signed the will in August, 2010. He had done so in the company of the other defendants and at Pioch's direction. On his third try, his forgery of Fewlas's signature appeared to pass muster with Pioch.[2]

---

[1] Only Mallory appealed my denial of the defense motions for a new trial, and the Circuit remanded on that issue only as to him. *Mallory*, *supra*, 902 F.3d at 596–97.

[2] Forensic evidence proved that the final version was not the first copy that Gary had signed, thereby corroborating his testimony.

The fact that IRS agents found a valid will, executed in 1993, when executing a search warrant at Fewlas's duplex, added credence to Gary's testimony. This was particularly true given the fact that someone (most likely Kurt[3]) had torn the will in half.

Gary was not immune from challenge. He had been estranged from Kurt, but they had reconciled, for the time being at least, when he signed the will.

In addition, though Gary initially told the others that he did not want any of the proceeds, which Gary wanted to go to his other children, later he demanded a share from Kurt, who refused the demand. He then confronted Pioch at her office and demanded $50,000 to keep silent. She, too, refused his demand. She also filed a police report asserting that Gary had tried to extort her.

Thereafter, Gary tried unsuccessfully to alert Probate Court personnel that he had signed a fake will. No one paid any attention to his contention.

And, of course, he was testifying for the government in exchange for leniency.

Nonetheless, I found during the trial, as necessarily did the jury, that, despite the indicia of bias and a self-serving desire for leniency, Gary's testimony was, on balance, credible, and plausible. His testimony withstood vigorous cross-examination and was buttressed by other evidence[4] and fair inferences therefrom.[5]

---

[3] There was evidence that Kurt believed that Fewlas had assets in excess of two million dollars, and that he expected to get his hands on those assets after Fewlas's death. Fewlas apparently had kept the nearly twenty-year old will in a safe in the basement; the agents found the safe open and the torn will nearby.

[4] *E.g.,* the government's handwriting expert's testimony.

[5] For example, had Gary's approach to Pioch been a baseless attempt to extort money, why would he have followed up on his threats to blow the whistle in the Probate Court?

## B. The "Pioch Was in Court" Contention

The defendants sought to rebut the evidence that the will was signed after Fewlas's death (namely, on August 30 or 31 or September 1, 2010) by asserting that Pioch's datebook and calendar showed she was in court on each of those days. Thus, according to their contention, she could not have participated in the forging of the will.

The problem with this "she couldn't have been there then" contention is that Pioch's own records show that she had upwards of three hours between her morning and afternoon court appearances on September 1, 2010. Within that time period, she quite clearly could have driven the three miles from the courthouse to Fewlas's residence, overseen the signing, and been on time for her second appearance. It would not have been hard for the jury to reject the "she couldn't have been there then" contention.

## C. Handwriting Testimony

The government's forensic witnesses provided substantial and thoroughly credible evidence corroborating Gary's testimony that he, not Fewlas, had signed the will.

First, David Olson, a "questioned document" examiner, opined that the purported Fewlas signature on the will was "probably" a simulation, not a genuine signature. Second, Jeanne Dietrich, a scientist working for the IRS, opined that the ink of the initials "MF" on the first and second pages of the will differed. Third, and curiously for the defendants – and Kurt in particular – four fingerprints matching his, but none of Fewlas's fingerprints, were found on the will.

All of this evidence was credible and persuasive.

While the defense offered a handwriting analyst who opined that the signature on the will was genuine, the government's cross-examination generated good reasons to doubt that conclusion.

The name "Martin" on the will had a "pen lift" between the "M" and the "a" and there was a dot above the "i" appeared above the crossed "t." Defendants' analyst conceded these characteristics were absent from a genuine exemplar of Fewlas's signature, which he had generated in June, 2010, shortly before the date on which, according to the defendants, Fewlas had signed the will leaving the estate to McKnight.

This concession, plus the overall greater credibility of the government's experts, fully justified believing the government's experts, rather than the defendants' expert.

### D. "Deserving Caretaker" Issue

The record clearly showed that Martin Fewlas cared for McKnight. He had known her as a child and allowed Kurt and her to live rent-free in his duplex. The government convincingly established, however, that his affection for her was not reciprocated, despite the defendants' claim that it had been.

Aside from Kurt's boasting about getting his hands of Fewlas's money, there was evidence that he had been abusive, not affectionate, toward him.

On these grounds alone, the jury could discredit the defendants' "deserving beneficiary" theory. Any doubt anyone might have had on that score was, however, completely erased by how Kurt and McKnight treated Fewlas's remains after his death: they put his ashes in a cardboard box, which they left behind when they moved out of the duplex, which was open to the elements. It and its water-soaked contents were later discovered where they had left them.

This disregard and disrespect undercut entirely their claim about how likely it was that Fewlas – who had expressed apprehensions before his death about Kurt – would leave his estate to McKnight. Doing so would make it possible – as occurred – for Kurt to gain control over the monies.

Moreover, there was evidence that Fewlas intended his estate to go to a surviving male heir. That was so, according to the testimony of the attorney who had prepared the valid 1993 will. This testimony confirmed the substantial unlikelihood that Fewlas would have left his estate to McKnight or anyone else other than a male heir.

### E. Pioch's Testimony Was Incredible

What was surely most compelling to the jury, just as it was for me, was the utter implausibility of Pioch's testimony. Without attempting to refer to all the reasons that this was so, I discuss her testimony as to: 1) her three false tax returns; and 2) manifestly bogus legal documents, aside from the fake will itself, that she prepared.

### 1. Tax Returns

The evidence showed that Pioch received a $200,000 check from the Fewlas estate. She did not report that income on her initial 2011 tax return.

Once the plot began to unravel,[6] Pioch filed two inconsistent and materially false amended 2011 returns. That she did so, and that her explanations were so manifestly implausible,

---

[6] How that happened is remarkable. McKnight, the beneficiary, cashed certificates of deposit, which were the principal asset of the estate. Though each transaction did not independently trigger a Currency Transaction Report, McKnight did not realize that transactions on the same day from the same institution, not just from separate branches, triggered a CTR by the institution. Fewlas had scattered many of the CDs among several Fifth/Third branches. On a number of occasions, McKnight's withdrawals from more than one branch on one day had resulted in CTR filings.

The Reports, in turn, altered the Criminal Investigation Division of the IRS. Two CID Agents went to McKnight's residence and invited her downtown. They asked her about her cashing of CDs. She denied that she had ever done so. That assertion, to say the least, caught the Agents' attention. Having been given that thread, the Agents tugged until the the scheme was undone.

With what they learned, the government wove the net of evidence that ultimately entangled the defendants. Had McKnight simply told the truth (that she'd made about $600,000 in withdrawals) as Fewlas's beneficiary, in all likelihood she'd have dispelled the Agent's concerns about the CTRS. In which case, all might well have remained ever after wrapped up tight.

7

confirmed her receipt of the $200,000 came from Fewlas's estate. Concurrently, those actions and her fabrications, both in the amended returns and on the stand, clearly manifested consciousness of guilt.

Pioch was an attorney. Her original 2011 return reported net income from her law practice of $101,000.00. A meticulously kept income and expense record attested to the accuracy of that accounting.

That first return failed to declare her $200,000 share of Fewlas's estate.

During the course of the investigation that got underway after McKnight's foolish response that she hadn't cashed any CDs, IRS Agents searched Pioch's home and office. Thus alerted to potential trouble ahead, Pioch hastened to file her first amended return. In that return, she reported the $200,000 as ordinary income, implausibly stating that she had "inadvertently missed some gross receipts" that roughly tripled her declared income. *Pioch*, *supra*, 2017 WL 1376410 at *4.

Thereafter Pioch learned that she could reduce the tax due on the $200,000 by declaring it to be a capital gain. Unable to leave unwell enough alone, she filed her second amended return reporting a $200,000 capital gain. She testified that, rather than getting the $200,000 from her law practice, it came from McKnight as payment for a half interest in an apartment building that Pioch owned. According to Pioch, she wanted to protect McKnight from spendthrifting her "inheritance" by rendering that portion of the proceeds illiquid.[7]

---

[7] Pioch had good reason to worry about McKnight's wayward ways with the proceeds. By the time the jury found the defendants guilty, Kurt and McKnight had disposed of all but about $750,000 of the $2.2 million in the estate. But I am persuaded, as I'm sure the jury was, that that purported concern was a pretext to mask her desire to avoid paying more taxes of the $200,000.

That the jury believed any of Pioch's testimony about her multiple tax returns is not at all possible. Once she was done with her direct testimony and the government, in turn, was done with its cross-examination, no rational person could give any credence whatsoever to her account. She was hoisted on not one but three petards of fabrication.

### 2. Legal Documents

### a. Fee Agreement

The evidence abounded with other problematic circumstances for Pioch – problems that she simply could not and most certainly did not overcome.

For one thing, Pioch's fee agreement with McKnight for her work on Fewlas' estate would have provided Pioch with a total fee of $500,000. This was so, even though Pioch's probate filing falsely stated that Fewlas's estate only amounted to $130,000, rather than $2.2 million. Had that been true, McKnight, a part-time bartender, had no possible or plausible way to pay a fee that was more than triple her "inheritance" as reported to the Probate Court.

Pioch explained that she charged such a hefty fee because she anticipated a will contest down the line. But there was testimony from an IRS Agent that, to earn such a fee at her hourly rate, Pioch would have had to expend nearly 2,000 hours on the case. That's equivalent to spending fifty forty-hour workweeks dedicated to nothing but the Fewlas/McKnight matter.

Fewlas had amassed a small fortune, to be sure, but any litigation would not have become a re-run of *Jarndyce and Jarndyce*.

For another, investigators found nearly $42,000 in cash in Pioch's apartment.

Some of the cash was bundled in Fifth/Third currency wrappers, suggesting that it had been among the proceeds McKnight had withdrawn from the various Fifth/Third branches she

had visited. Moreover, one envelope full of cash had a note, which the jury easily could infer was from McKnight, stating, "Sue, this is 27,000 . . . I owe you 13,000."

### b. Bogus Draft Power of Attorney

Pioch's defense exhibit 505 was an unexecuted power of attorney – which Pioch admittedly drafted – purporting to allow McKnight to act on Fewlas's behalf.

The document was dated June, 2010, but Fewlas (or someone purporting to be Fewlas) never signed the power of attorney. Critically, the document permitted McKnight to dispose of all of Fewlas' real property, including property on Airport Road in Toledo. But the government's evidence credibly established that Fewlas never owned that property: rather, Kurt had bought the property in 2012, long after Fewlas's death.

Also significant was what was not to be found with regard to any putative legal work by Pioch antedating Fewlas's death and the forged will. The Agents did not find, and Pioch did not proffer, any records of billings to or receipts from Fewlas. No law practice files or legal correspondence related to Fewlas ever surfaced. As to work for him, Pioch's slate was blank.

## Conclusion

The jury's verdict indisputably reflected its well-founded and firmly grounded credibility assessments. The evidence against the defendants was such that rational jurors could only make those assessments as it did. That verdict was not contrary to the manifest weight of the evidence. It was, rather, completely in line with not just the manifest, but the overwhelming weight of the evidence.

Four people concocted a scheme that seemed foolproof, but in the end was foolhardy.

It is, therefore,

ORDERED THAT defendant Kurt Mallory's motion for a new trial (Doc. 336) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr<br>Sr. U.S. District Judge